**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Commercial Financial Services, Inc., | ) | |
| | ) | |
| Doerner, Saunders, Daniel & Anderson, | ) | Case No. 05-CV-739 TCK/SAJ |
| | ) | |
| Appellant, | ) | Consolidated with 06-CV-280 |
| | ) | TCK/SAJ |
| vs. | ) | |
| | ) | |
| Stephen A. Jay, Trustee of the Unsecured | ) | |
| Creditors Liquidating Trust, and Lloyd T. | ) | |
| Whitaker, Trustee of the ABS Liquidating | ) | |
| Trust, | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

**REPORT AND RECOMMENDATION**

Pursuant to reference from the District Court, comes on for report and recommendation this consolidated appeal of the Order Granting in Part ABS Liquidating Trustee's and Unsecured Creditors Liquidating Trustee's ("Trustees/Committee") Joint Motion for Summary Judgment and Order Denying Doerner, Saunders, Daniel & Anderson, L.L.P.'s ("DSDA") Cross Motion for Summary Judgment ("2005 Order"), entered by the United States Bankruptcy Court for the Northern District of Oklahoma on November 21, 2005.

This court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158. All issues have been fully adjudicated in the Bankruptcy Court and this matter is ripe for appeal.

This court acknowledges the time, effort and thoroughness of the briefing by both sides.  This court also appreciates the meticulous and exhaustive research and analysis in the 52 page 2005 Order and the subsequent Order which set forth the amount of the sanction entered in April, 2006 ("April 2006 Order").  However, this court respectfully finds that the award of attorney fees by the Bankruptcy Court as a sanction constitutes an abuse of discretion. This court therefore recommends that both Orders be vacated and set aside for the reasons hereinafter set forth.

## I. BACKGROUND[1]

This appeal arises out of a contested matter which was part of the bankruptcy of Commercial Financial Services, Inc., ("CFS") and has been designated the "DSDA Contested Matter". In the bankruptcy, DSDA represented CFS as special counsel with respect to certain labor matters, having been appointed by the Bankruptcy Court for that limited purpose pursuant to Section 327(e) of the Bankruptcy Code in January, 1999. DSDA had previously represented CFS in connection with various employment/labor matters prepetition.

In the fall of 1999, fifteen (15) lawsuits were filed against CFS in state and/or federal court ("Securities Fraud Litigation") by the holders of asset-backed securities issued on behalf of or for the benefit of CFS. Arthur Andersen LLP ("Andersen") was a named defendant in some of the cases filed. Andersen had been retained by CFS to audit its financial statements in the securitization transactions. Shortly after the filing of the lawsuits, in September 1999,  DSDA was contacted by Wiel, Gotshall & Manges, L.L.P., ("WGM")

---

[1] The  2005 Order from the Bankruptcy Court contains a thorough, concise and accurate factual history of this dispute.

in regard to defending Andersen in the Securities Fraud Litigation.

DSDA entered an appearance on behalf of Andersen on January 25, 2000 in the CFS Securities Fraud Litigation. DSDA signed discovery responses on behalf of Andersen in connection with Rule 2004 discovery conducted in the bankruptcy case the same day. On January 26, 2000, one of the Trustees e-mailed CFS's counsel to inquire whether CFS had consented to DSDA's representation of Andersen. CFS's counsel advised CFS had not been asked to consent and was not aware that DSDA was representing Andersen.  CFS's counsel instructed local counsel to mail DSDA a copy of a motion to disqualify CFS had filed in regard to disqualifying another law firm and determine DSDA's position. In response, on January 28, 2000, DSDA withdrew from representing Andersen.

On February 7, 2000, DSDA filed a Supplemental Disclosure in which it disclosed on the record that it had been contacted on September 24, 1999 by WGM to represent Andersen in the Securities Fraud Litigation, that three cases were filed in state and federal court, that DSDA did not enter appearance in any of the three cases because Andersen was not named as a defendant in two and obtained a tolling agreement in the third, that on January 25, 2000, WGM served discovery responses in the bankruptcy proceeding which listed DSDA as counsel for Andersen, that upon being advised that Andersen was listed as a creditor of CFS on January 28, 2000, DSDA withdrew as counsel.

On June 6, 2000, DSDA was contacted by Jenner & Block ("J&B"), CFS's lead bankruptcy counsel, to represent the firm and certain of its members and former members, to defend  the firm against requests for sanctions in connection with litigation entitled *CFS v. Gertrude Brady* ("Brady litigation").  DSDA requested that J&B inquire of CFS regarding a conflict waiver which would allow DSDA to represent Andersen in the Securities Fraud

Litigation. On June 14, 2000, DSDA sent a letter to J&B, documenting an agreement between DSDA and CFS by which CFS agreed to a broad conflict waiver, allowing DSDA to represent Andersen in the Securities Fraud Litigation.

DSDA filed a Second Supplemental Disclosure on June 26, 2000, in which it disclosed its retention by J&B in the Brady litigation.  There was no mention of the CFS conflict waiver agreement.

In April, 2001, Andersen solicited DSDA's representation in the Securities Fraud Litigation. By that time, DSDA no longer represented J&B and its representation of CFS in employment matters, while ongoing, was winding down. A new waiver of the conflict of interest was signed by CFS on April 27, 2001.  In reliance on that waiver, on May 10, 2001, DSDA entered appearance on behalf of Andersen in each of the then pending Securities Fraud Litigation cases.  One of the Trustees again inquired of CFS about a conflict waiver, there having been no disclosure of the June 2000 and/or April 2001 letter agreements.

On June 18, 2001, DSDA filed a Third Supplemental Disclosure in which DSDA disclosed its re-engagement by Andersen. No mention was made that the June 2000 letter agreement was procured by request made through J&B.

Trustees filed an Objection on June 25, 2001, contending the interests of Andersen were adverse to CFS;  that the conflict violated Section 327 of the Bankruptcy Code and Rule 1.7 of the Oklahoma Rules of Professional Conduct;  that DSDA failed to disclose the June 14, 2000 conflict waiver in its Second Supplemental Disclosure filed June 26, 2000; that because of the relationship between J&B and DSDA as its counsel, J&B could not have offered disinterested advice to CFS regarding the conflict waiver; that all circumstances should have been revealed in the Second Supplemental Disclosure; that

4

under Rule 1.7, DSDA was precluded from undertaking Andersen's representation because of the directly adverse interests of Andersen and CFS;  that the delay in disclosure conflicted with the purpose of Rule 2014 and precluded the "effective evaluation by the Court and interested parties" of the dual representation; and, that the Third Supplemental Disclosure was inadequate and further investigation and disclosure by DSDA was appropriate.  Trustees requested a hearing. On July 17, 2001, Trustees filed a second objection. This began the first of two phases of the DSDA Contested Matter, and came to be known as the "Rule 1.7/Disqualification Phase."

On August 6, 2001, DSDA filed a motion to withdraw as Special Labor and Employment Counsel for Debtor CFS. An objection followed by one of the Trustees. This became moot as a result of confirmation of CFS's Second Amended Plan of Orderly Liquidation on September 15, 2001.

On August 28, 2001, CFS filed a malpractice action against Andersen in state court.

On January 2, 2002, Trustees filed a joint motion for summary judgment in the DSDA Contested Matter solely on the issue of whether DSDA violated Rule 1.7 by simultaneously representing Andersen and CFS.  Cross motion for summary judgment was filed by DSDA. Neither party requested a determination as to whether DSDA's conduct with respect to the conflict waiver violated Bankruptcy Rule 2014.

On June 17, 2002, the Bankruptcy Court issued a Report and Recommendation to the District Court recommending the reference be withdrawn in the DSDA Contested Matter so the District Court could determine whether circumstances warranted DSDA's disqualification from representing Andersen in the Securities Fraud Litigation.  Reference was withdrawn solely for that purpose.

The Rule 1.7 Disqualification Phase was referred to the undersigned Magistrate Judge.  A  Report and Recommendation was entered  on November 14, 2002,  finding  the interests of CFS and Andersen to be directly adverse and that DSDA could not represent both parties unless that conflict was waived under Rule 1.7. That Report and Recommendation concluded  that the waiver of the conflict must be approved by the Bankruptcy Court, which approval was never obtained.

Objections were filed on appeal to United States District Judge Terence Kern. By Order entered on April 10, 2003, ("2003 Order"), Judge Kern rejected Trustees' efforts to disqualify DSDA from representing Andersen in the Securities Fraud Litigation brought by holders of CFS securities.  The ruling was based upon a finding that Trustees lacked standing to seek DSDA's disqualification because they were never parties in the Securities Fraud Litigation. Alternatively, the Court concluded that DSDA's representation of Andersen did not violate Rule 1.7(a) of the Oklahoma Rules of Professional Conduct, and that, in any event, the remedy of disqualification would not have been appropriate because a valid waiver of that conflict had been obtained from CFS and the waiver did not require Bankruptcy Court approval.  The Rule 1.7/Disqualification Phase  ended with the Tenth Circuit Court of Appeal's confirming Judge Kern's dismissal for lack of standing to sue.

Following remand to the Bankruptcy Court, the second phase of the DSDA Contested Matter began when a Motion for Summary Judgment was filed by Trustees. ("Rule 2014 Phase"). Trustees sought a ruling from the Bankruptcy Court that DSDA had violated Rule 2014 of the Federal Rules of Bankruptcy Procedure by failing to disclose, in June, 2000, a prospective conflict waiver it had received from CFS during that month. Trustees sought an order from the Bankruptcy Court sanctioning DSDA in an amount which

would make CFS's estate whole for the costs, including reasonable attorney's fees, incurred in the DSDA Contested Matter.

On November 21, 2005, the Bankruptcy Court entered an Order ("2005 Order") finding that DSDA had violated its Rule 2014(a) disclosure obligations by failing, on multiple occasions, to timely disclose to the court all of its "connections" with CFS, with CFS's lead counsel J&B, and with Andersen.

On April 25, 2006, an Order ("April 2006 Order") was entered by the Bankruptcy Court sanctioning DSDA pursuant to the Court's inherent powers for all Trustees' "necessary and reasonable" fees and expenses concerning the Rule 1.7/Disqualification Phase of the Contested Matter, and $40,727.00 for the Rule 2014 phase of the DSDA Contested Matter.  After thoroughly considering the affidavits and pleadings submitted pursuant to the 2005 Order, the April 2006 Order directed DSDA to reimburse the CFS Trust for services provided as follows:

| Provider | Amount |
|---|---|
| Glass Law Firm ("GLF") | 28,585.08 |
| Gable & Gotwals ("G & G") | 7,886.90 |
| Kilpatrick Stockton | 900.00 |
| | $37,371.98 |

The order further directed DSDA to reimburse the Unsecured Creditors Liquidating Trustee ("UCLT")  for services provided as follows:

| | |
|---|---|
| GLF | 312,916.46 |
| Rife Walters | 19,528.98 |
| | $332,445.44 |

7

DSDA was further ordered to reimburse the ABS Liquidating Trust for services provided as follows:

| | |
|---|---|
| G & G | 137,719.40 |
| Kilpatrick Stockton | 17,801.30 |
| | $155,520.70 |

The total reimbursement to be paid by DSDA as a sanction was $525,336.98.

## II. STANDARD OF REVIEW

"In reviewing a bankruptcy court decision under 28 U.S.C. §158(a) and (d), the district court and the court of appeals apply the same standards of review that govern appellate review in other cases." *Jenkins v. Hodes (In re Hodes),* 402 F.3d 1005, 1008 (10th Cir. 2005).  DSDA urges application of a *de novo* standard of review because the bankruptcy court granted Trustees' motion for summary judgment seeking sanctions against DSDA.  When reviewing the bankruptcy court's decision to impose sanctions, however, the Tenth Circuit stated that the proper standard of review is for "abuse of discretion," rather than a *de novo* standard.  *Udall v. FDIC ( In re Nursery Land Dev. Inc.),* 91 F.3d 1414, 1415 (10th Cir. 1996); *Findlay v. Banks ( In re Cascade Energy & Metals Corp.),* 87 F.3d 1146, 1149-50 (10th Cir. 1996).  In *Findlay*, the Court unequivocally limited the scope of review: "[o]nly by applying an abuse-of-discretion standard can the district court in this situation properly function as an appellate court."  *Id.* at 1150.

## III. ARGUMENTS AND AUTHORITY

### A. When is a Finding of Bad Faith Required For the Court to Impose Sanctions Pursuant to the Court's Inherent Powers?

The 2005 Order finds, at page 52, "[T]he Court may impose sanctions for *non-*

*disclosure* (as opposed to failing to maintain the requisite disinterestedness) even if disclosure would not have resulted in a finding of a conflict of interest or disqualification, *and* the Court has 'wide discretion in [the] selection of an appropriate remedy' for violation of Bankruptcy Rule 2014**."** (Second emphasis added).    The 2005 Order cites to no statutory authority for imposition of the sanction.  It is clear the sanction is awarded under the  inherent authority of  the court.  The 2005 Order cites numerous cases describing  the possible sanctions for non-disclosure but does not discuss the level of malfeasance or bad faith legally required before such sanctions fall within the inherent power of the court.  It appears  that any requirement for explicit findings of bad faith was emphasized for the first time in this appeal, giving the Bankruptcy Court no opportunity or reason to reach that issue in the 2005 Order.

DSDA argues that a sanction entered under the inherent powers of the court carries an elevated burden of proof and is proper only when there is clear evidence that  the challenged conduct was entirely without color and was pursued for an improper purpose with articulated evidence that counsel acted vexatiously with bad faith.  DSDA's argument is based on *Chambers v. NASCO Inc.,* 501 U.S. 32, 50 (1991) as applied by the Tenth Circuit in *Autorama Corp. v. Stewart,* 802 F.2d 1284, 1288 (10th Cir. 1986).  *See also Dow Chem. Pac. Ltd. v. Rascator Maritime S.A.,* 782 F.2d 329, 344 (2nd Cir. 1986) (requiring clear evidence of bad faith).

Trustees agree there is no statutory authority for the sanction and it falls within the inherent power of the court. They further argue that *Chambers* is a fee shifting case in which the Supreme Court affirms an exception to the American Rule that a prevailing party

cannot be awarded fees against a losing party unless the losing party is guilty of vexatious actions committed with  bad faith.  Trustees argue that is not the situation in the case at bar.   Their position is there were a variety of sanctions available to the Bankruptcy Court and the Court selected the one which would make the bankruptcy estate whole by requiring DSDA to reimburse the estate for attorney fees expended by the estate. Trustees argue the court was not awarding fees to the prevailing party as an exception to the American rule. They argue the Bankruptcy Court awarded a sanction for violation of a Bankruptcy rule which does not require a finding of bad faith. The Bankruptcy Court's language in the 2005 Order describes the attorney fee assessment as a sanction.

Addressing  these conflicting interpretations of the Bankruptcy Court's ruling, two conclusions  are clear.  First, *Chambers* does establish a bad faith finding as a prerequisite to assessment of attorney fees against the losing party.  The Supreme Court noted:

> In *Roadway Express*, a party failed to comply with discovery orders and a court order concerning the schedule for filing briefs.After determining that §1927, as it then existed, would not allow for the assessment of attorney's fees, we remanded the case for a consideration of sanctions under *both* Federal Rule of Civil Procedure 37 *and* the court's inherent power, while recognizing that invocation of the inherent power would require a finding of bad faith.[2]

The *Chambers* court again referred to *Roadway Express* in support of its pronouncement that: " A court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees."[3]

---

[2] 501 U.S. at 49, citing *Roadway Express, Inc.,  v. Piper*, 447 U.S. 752, 755 (1980).

[3] *Chambers*, 501 U.S. at 50 (citing *Roadway Express*, 447 U.S. at 767).

This bad faith requirement is further confirmed in Justice Scalia's dissent in which he suggests "some explanation might be useful regarding the 'bad faith' limitation that the Court alludes to today." *Chambers*, 501 U.S. at 58.  Discussing the American Rule, Justice Scalia finds,

> That rule, "deeply rooted in our history and in congressional policy," prevents a court (without statutory authorization) from engaging in what might be termed *substantive* fee shifting, that is, fee shifting as part of the merits award.  It does not in principle bar fee shifting as a sanction for procedural abuse. We have held, however-in my view as a means of preventing erosion or evasion of the American Rule-that *even fee shifting as a sanction can only be imposed for litigation conduct characterized by bad faith.*(emphasis added). *Id.* at 59 (citations omitted)

Extensive Tenth Circuit authority has confirmed the bad faith prerequisite to awarding such sanctions under the court's inherent powers.  *See generally Sally Beauty Co., Inc. v. Beautyco, Inc.*, 372 F.3d 1186, 1189 (10th Cir. 2004)**.**  The Tenth Circuit has clarified that *Chambers* and its progeny apply to the bankruptcy courts.  *See In re Courtesy Inns, Ltd., Inc.,* 40 F.3d 1084, 1089 (10th Cir. 1994).  The Bankruptcy Court for the Northern District of Oklahoma has recognized the applicability of *Chambers* in noting  the requirement of "subjective bad faith and vexatious, wanton and oppressive conduct" before the court may invoke inherent power to award attorney fees as a sanction. *In re Nichols, II,* 221 B.R. 275, 280 (N.D. Okla. 1998).

> The Court must be its own guardian in protecting judicial integrity and preventing abuse of process.  However, when invoking inherent powers to sanction independently or in conjunction with Fed. R. Bankr. P. 9011, the courts have generally found subjective bad faith and vexatious, wanton and oppressive conduct. As stated above, the Court found that Mr. Nichols advanced a colorable legal argument and did not act in subjective bad faith.  The Court does not find conduct so vexatious, wanton or oppressive to justify sanctions.  Therefore,

11

the Court will not award sanctions against Mr. Nichols under its inherent and equitable powers. *Id.* at 279-280 (citations omitted).

The second conclusion is that there are many sanctions awarded by courts that do not require a finding of bad faith.  Justice Scalia also addresses this in his dissent in *Chambers*. "But that in no way means that *all* sanctions imposed under the courts' inherent authority require a finding of bad faith. They do not."[4]  "Since necessity does not depend upon a litigant's state of mind, the inherent sanctioning power must extend to situations involving less than bad faith."[5]

The 2005 Order is obviously the product of meticulous labor and exhaustive research, containing some twenty (20) citations to cases in which sanctions were awarded for failure to comply with Rule 2014 disclosure requirements.[6]  A sampling of those cases reveals no explicit bad faith finding as a prerequisite to sanctions.

A bankruptcy court's work relies so heavily on full and complete voluntary disclosure of conflicts under Rule 2014 that several courts have found failure to abide by the disclosure requirement is enough to disqualify an attorney and deny compensation, regardless of whether the undisclosed connection is material or deminimis. See. e.g., *In re Condor Sys., Inc.*, 302 B.R. 55, 69-71 (Bankr.N.D. Cal. 2003).  Full disclosure is so important that sanctions for non-disclosure may be appropriate even when the non-disclosed connection

---

[4] *Chambers,* 501 U.S. at 59 (citing *Redfield v. Ystalyfera Iron Co.*, 110 U. S. 174, 176 (1884) (dismissal appropriate for unexcused delay in prosecution)).

[5] Chambers, 501 U.S. at 58-59.

[6] Order at 53, n. 38, 39 and 40.

would not have disqualified counsel and regardless of the good or bad faith of counsel.[7]

Sanctions may be imposed even where the non-disclosure causes no real harm to the estate

or its creditors.[8]

> Neither the bankruptcy court or the trustee ... should have the
> awesome responsibility of combing through the often voluminous
> materials that are filed with the court in order to ascertain every
> possible conflict of interest in a particular case, especially when a
> professional's potential conflicts are required to be disclosed in the
> application itself.

*In re Pierce*, 809 F. 2d 1356, 1363 n. 20 ( 8th Cir. 1987); *see also In re Tinley Plaza*, 142 B.R. 272, at 278-79 (Bankr. ND Ill. 1992); *In re Rusty Jones, Inc.,* 134 B.R. 321, 345 Bankr. N.D. Ill. 1991).

On the one hand, we have *Chambers* and its progeny clearly requiring a prerequisite

finding of bad faith before the sanction of fees can be granted.  On the other, we have a

mass of bankruptcy court cases imposing sanctions with a strict liability, no tolerance

standard of compliance on Rule 2014 disclosures with no bad faith prerequisite.  Which

scenario is closest to the case at bar?

This court finds the answer to that question in the many cases cited in the 2005 Order.

The Bankruptcy Judge found that "[P]ossible sanctions for non-disclosure include

disgorgement of interim compensation, denial of requested compensation, and/or requiring

the non-disclosing party to pay for the costs of an investigation or other detriment to the

estate caused by the failure to disclose."[9]

A review of the fifteen (15) plus cases cited in support of the Bankruptcy Court's

---

[7]/ Order at 43.

[8]/ Order at 55.

[9]/ Order at 53.

position reveals the sanctions awarded consist of denied compensation, revocation of employment orders and disgorgement of fees paid. Trustees asked the court to order DSDA to disgorge the $185,360.25 in interim payments that it received for services in employment matters and to disallow the $60,323.58 requested in the third interim fee application. The 2005 Order considered disgorgement of fees as a sanction and rejected it.

> Because the Court concludes that the labor and employment services DSDA provided to the estate were actually and necessarily provided to the estate, and that connections that DSDA failed to disclose would not have disqualified DSDA to serve as special labor and employment counsel to the estate, the Court will not order disgorgement of fees or deny DSDA's final application for the fees and expenses as a sanction for violating Bankruptcy Rule 2014.[10]

Only two cases fall in the category of "requiring the non-disclosing party to pay for the costs of an investigation or other detriment to the estate caused by the failure to disclose." The court in *In re Imperial Corp. of Am.,* 181 B.R. 501, 508 (Bankr. S.D. Cal. 1995) found there was a conflict of interest that would have disqualified counsel from some participation and the "appropriate sanction is to impose the entire cost of this motion on S & G rather than ordering disgorgement of all of its compensation." There is no mention of bad faith but the court noted it was left with "the distinct impression S & G's failure to disclose was not 'inadvertent.'"

In a case most similar to the case at bar, *In re Leslie Fay Cos., Inc.,* 175 B.R. 525 (Bankr. S.D.N.Y. 1994), the court appointed an examiner to investigate any alleged undisclosed connections and conflicts. The court found there were very real conflicts, that the bankrupt estate had suffered very real harm and ordered a disgorgement from Weil

---

[10] Order at 56.

14

Gotshal as follows:

> Given that I am disqualifying Wiel Gotshal from handling new matters, I am limiting the economic sanction to dis-gorgement of the costs, direct and indirect, of both of the examiner's investigations and of the failure to disclose.[11]

There is no discussion of bad faith but the court found there were very real conflicts, well beyond de minimus and disqualified Weil Gotshal from handling new matters.  The court also found real harm to the bankrupt estate. *Id.* at 537.

This court finds that the Bankruptcy Court's action in this case falls sufficiently within the parameters of the *Chambers* case that a bad faith requirement must be satisfied because of the complete shifting of all fees for the matter in question.  The 2005 Order requires DSDA to pay all attorney fees and expenses incurred by the Trustees in connection with the DSDA Contested Matter from June 18, 2001 to date of the Order, which was determined to be $525,336.98.  There has been no sanction of disgorgement, no denial of fees and no termination of employment.  This court has been referred to no other case in which there has been such a complete shifting of fees unrelated to a disgorgement of fees received, denial of fees or termination of employment.

It is one thing to deny compensation, revoke employment or even disgorge fees paid for failure to disclose conflicts under Rule 2014 where that conflict relates to the employment.  It is quite another to order the payment of all attorney fees and expenses totaling over a half a million dollars  relating to two separate proceedings for a delay in disclosing  a non-disqualifying conflict.  Surely bad faith must be shown to justify such a sanction.

The application of *Chambers* in this case is inexact because *Chambers* is about

---

[11]/ *Id.* at 16.

awarding attorneys fees to the prevailing party. The great majority of the fees awarded in this case relate to the Rule 1.7 Disqualification Phase on which Trustees were not the prevailing party. Trustees were the prevailing party on the Motion for Summary Judgment requesting a ruling that DSDA violated Rule 2014. As a part of that motion, Trustees requested as a sanction all of their fees and expenses for the Rule 1.7 Disqualification Phase, on which they were not the prevailing party, and the Rule 2014 proceeding, on which they were the prevailing party. Also, the 2005 Order never says that attorney fees are awarded to a prevailing party as an exception to the American Rule. The 2005 Order repeatedly references its purpose is to sanction a violation of Rule 2014.

This court finds that *Chambers* does apply because the sanction order is definitely about fee shifting. The bad faith requirement to award fees to a prevailing party surely should be heightened where the award is to the losing party. Even if the *Chambers* case is found inapplicable to the case at bar as a fee shifting case, not a sanctions case, the issues of bad faith, lack of disqualification and harm to the estate are still very relevant to the imposition of a sanction. The cases cited in the 2005 Order may make no explicit finding of bad faith. However, they all articulate in detail the malfeasance that generated the sanction and demonstrate the reasons the sanction is appropriate for the misconduct described.

## B. Did DSDA Waive the Bad Faith Argument?

Trustees argue that the 2005 Order does not make specific findings of bad faith because DSDA did not make its arguments regarding bad faith, colorability and improper purpose before the Bankruptcy Court, raising them for the first time on appeal. Trustees correctly argue that bankruptcy appeals are limited to points raised before the Bankruptcy Court. The prohibition against raising issues for the first time on appeal is "essential in order

16

that parties may have the opportunity to offer all the evidence they believe relevant to the issues . . . [and] in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence." *Singleton v. Wulff,* 428 U.S. 106, 120 (1976).  The Tenth Circuit has explained that, "review of issues not raised below 'would require us to frequently remand for additional evidence gathering and findings'." *Lyons v. Jefferson Bank & Trust,* 994 F.2d 716, 721 (10th Cir. 1993).

This court agrees with Trustee's argument that an explicit finding of bad faith in the 2005 Order is not essential for invoking the court's inherent power.  Even in instances where bad faith is required for a court to invoke its inherent sanctioning power, the court need not make an explicit finding of bad faith.  Factual findings of conduct "tantamount to bad faith" are sufficient.  *See e.g.*, *B.K.B. v. Maui Police Dep't,* 276 F.3d 1091, 1108 (9th Cir. 2002). "Reversing an order imposing sanctions . . . simply because the sanctioning court did not use the words 'bad faith' would needlessly  elevate form over substance."  *In re Rimsat, Ltd.,* 212 F.3d 1039, 1047 (7th Cir. 2000).

One  purpose underlying the rule is to keep evidentiary issues not presented to the trial court from being raised on appeal.  In the case at bar the absence or presence of bad faith or improper conduct was thoroughly argued by DSDA and the Trustees before the trial judge.  The 2005 Order makes many factual findings outlining the offending conduct and alleged malfeasance of DSDA.   Had the *Chambers* case and the explicit bad faith requirement been argued to the trial judge, the findings of the trial judge could not be more specific in outlining the improper conduct.    The court finds no waiver of the bad faith argument.  In DSDA'S defense on this issue, DSDA did not know prior to the 2005 Order which of the sanctions requested would be granted, that the sanction would be the

17

assessment of all attorney fees, or the degree to which bad faith would be relevant to the

sanction selected.

### C.  Did DSDA Violate Rule 2014?

The court now turns to the question of whether DSDA did in fact violate Rule 2014.

Bankruptcy Rule 2014(a) states, in pertinent part:

> An order approving the employment of attorneys . . . or other
> professionals . . . shall be made only on application of the trustees or
> committee. The application shall be filed and, . . . a copy of the
> application shall be transmitted by the applicant to the United States
> trustee.  The application shall state the specific facts showing the
> necessity for the employment, the name of the person to be employed,
> the reasons for the selection, the professional services to be rendered,
> any proposed arrangement for compensation, and, to the best of the
> applicant's knowledge, all of the person's connections with the debtor,
> creditors, any other party in interest, their respective attorneys and
> accountants, the United States trustee, or any person employed in the
> office of the United States trustee. The application shall be accompanied
> by a verified statement of the person to be employed setting forth the
> person's connections with the debtor, creditors, any other party in
> interest, their respective attorneys and accountants, the United States
> trustee, or any person employed in the office of the United States
> trustee.

Rule 2014(a) requires all professionals seeking employment to reveal "connections"

with the debtor.  This includes all connections with the debtor, not just those creating a

conflict of interest.  "[T]he duty to disclose is a continuing duty that survives the initial filing

of the application for employment, and continues even after a professional's employment is

approved." *In re Keller Fin. Serv. of Florida, Inc.*, 248 B.R. 859, 898 (Bankr. M.D. Fla. 2000)

citing *In re Diamond Mortgage Corp.*, 135 B. R. 78, 90 (Bankr. N.D. Ill. 1990).

The undisputed facts are that DSDA entered an appearance in the CFS Securities

Fraud Litigation for Andersen on January 25, 2000.  Trustees inquired about the conflict and

DSDA withdrew from representing Andersen on January 28, 2000.  This representation of

Andersen was first disclosed on February 7, 2000,  twelve (12) days after the conflict arose by DSDA entering an appearance in the case**.**

DSDA again entered an appearance on behalf of Andersen on May 10, 2001.  Trustee again inquired about the conflict of interest on May 21, 2001. On June 18,  2001, DSDA filed a disclosure revealing the conflict and revealing that the conflict had been previously waived in writing by CFS by a letter dated June 14, 2000.  A second written  waiver of the conflict from CFS was obtained dated April 27, 2001.   This disclosure was filed thirty-eight (38) days after DSDA filed its second appearance on behalf of Andersen in the Securities Fraud Litigation.  DSDA was representing Andersen in the CFS related Securities Fraud Litigation while simultaneously representing CFS in employment matters before Trustees had an opportunity to object to the conflict waiver.

DSDA argues its delay in disclosing the conflict is fully justified under the law. First, DSDA argues that the Rule 2014 duty to disclose is confined, in the case of counsel hired pursuant to 11 U.S.C. § 327(e), to the area of counsel's special employment and the courts will not disqualify or otherwise sanction § 327(e) counsel for failure to disclose connections or conflicts that lie outside that area of employment.  Section 327(e) provides:

> The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

DSDA relies on *In re Servico, Inc.,* 149 B.R. 1009 (Bankr. S.D.Fla. 1993).  In that case, the court found that the failure to disclose a potentially preferential payment received from the debtor did not violate Rule 2014 because such connection would not have

disqualified counsel from representing the debtor under § 327(e).  *Id.* at 1013-1014.  This court agrees with the 2005 Order at bar that *In re Servico, Inc.,* is not  in accord with most courts to consider the issue.  DSDA's position is not supported by the plain language of Rule 2014.  The many cases cited in the 2005 Order  find  that all connections must be disclosed, regardless of whether they create a conflict under §327(e).[12]  The 2005 Order  finds  that the conflict or connection which was not disclosed would not have disqualified DSDA from representing CFS in the employment matters.[13]

Second, DSDA argues that the conflict was not timely disclosed because the conflict would not have disqualified DSDA from acting outside the confines of its §327(e) employment and there is no obligation to disclose a non-disqualifying connection or conflict. Again, the 2005 Order is exhaustively thorough in presenting the numerous cases finding "the duty to disclose connections is unrelated to the level of conflict the connection does or does not create."[14]

"Professionals must disclose all connections with the debtor, creditors, and parties in interest, *no matter how irrelevant or trivial those connections may seem.*" *In re Triple Star Welding Inc., (Movitz v. Baker),* 778, 789 (9th Cir. BAP, 2005). Under Rule 2014, "all connections" that are not so remote as to be *de minimus* must be disclosed.  Consequently, there is "no merit to the . . .argument that [a party] did not have to disclose its connections. . .because its attorneys did not feel that a conflict existed. " *In re Leslie Fay Cos.*, 175 B.R. at 536 (quoting *In re Rusty Jones, Inc.*, 134 B.R. at 345).

---

[12] Order at 40, 43.

[13] Order at 56.

[14] Order at 43.

Third,  DSDA argues that even if there was a disqualifying conflict, DSDA had obtained a valid effective waiver of that conflict so there was no obligation to disclose.  This, as the 2005 Order states, is not relevant to the question of whether there is a an obligation to disclose under  Rule 2014.   In fact, the action by DSDA which the 2005 Order finds most damning is that the conflict waiver was obtained from CFS, a bankrupt debtor, without notice.  The 2005 Order finds this deprived interested parties the opportunity to object and denied the Bankruptcy Court the opportunity to approve or reject the waiver.

In determining whether DSDA violated Rule 2014 disclosure obligations, both sides (and the 2005 Order) have presented numerous cases supporting their positions.  Each case is very much decided on its own facts.  The parties parse and quibble the facts of each case to support their position.  It does appear the majority of the cases would find an obligation of disclosure in the case at bar.  There are certainly a few cases that appear not to support such  an obligation under these facts.   Only one case considers the obligation to disclose a conflict waiver.  In *In re Jore Corp.,* 298 B .R. 703 (Bankr. D. Mont. 2003) the court found a violation of Rule 2014 by failing to disclose an exception contained within a conflict waiver and sanctioned counsel by ordering disgorgement of all fees paid and disqualified counsel from further employment in the case. *Id.* at 731-32.

Rule 2014 is a bankruptcy court rule.  The interpretation of that rule by the specialist bankruptcy court should not be rejected by the generalist district court unless there is a clear abuse of discretion.  The bankruptcy courts are best able to know the level of disclosures needed for proper administration of their courts.  Therefore this court finds no abuse of discretion and confirms the finding of the 2005 Order that there were multiple new connections that should have been more timely disclosed under Rule 2014, including the representation

21

of Andersen, the June 14, 2000 waiver and the April 27, 2001 waiver by CFS, and the additional connection with J & B, the debtor's general bankruptcy counsel. Having noted the specialist expertise of the Bankruptcy Court on Rule 2014, this court now moves to the questions of sanctions and bad faith which more typically fall within the generalist purview of the district court.

Before the court is a case of tardy disclosure, not a failure to disclose. Courts have found that disclosure is required "as soon as counsel acquires even constructive knowledge reasonably suggesting an actual or potential conflict." *Rome v. Braunstein,* 19 F.3d 54, 59 (1st Cir. 1994). "Tardy disclosure is sanctionable because it may result in the ripening of a potential conflict into an actual conflict, and may 'disrupt the case to the detriment of the debtor, creditors or the estate or simmer below the horizons of view by the Court or creditors, thereby accomplishing real damage unperceived until incurable.' "[15] Thus, the question to be answered is whether DSDA's delayed disclosure has disrupted the case to the detriment of the debtor, creditors or the estate, accomplishing real damage, unperceived until incurable.

### D. Is There Bad Faith to Justify the Sanction Imposed?

The 2005 Order appropriately finds that DSDA's good faith intentions, lack of disqualifying conflicts and the harm or lack of harm to the bankrupt estate are irrelevant to the question of whether DSDA violated the disclosure requirements of Rule 2014. This court affirms that finding. However, these issues are very relevant to the question of what sanction might be set, if any. The good or bad faith of DSDA in its actions, disqualifications resulting from any conflict and harm to the bankrupt estate are relevant to what punishment

---

[15] 2005 Order at 47, (quoting *Halbert v. Yousif*, 225 B.R.336, 347 n. 20(E.D. Mich. 1998), (quoting *In re Automend, Inc.*, 85 B.R. 173, 178 (Bankr. N.D. Ga. 1988)).

may be appropriate.

To fall within the bad faith exception to the American Rule, a party's claim "must be entirely without color and asserted wantonly, 'for purposes of harassment or delay, or for other improper reasons.'" *San Juan Prods., Inc. v. San Juan Pools of Kansas, Inc. ,* 849 F. 2d 468, 476 (10th Cir. 1988).   "The appropriate focus for the court in applying the bad-faith exception to the American Rule is the conduct of the party in instigating or maintaining the litigation, for an assessment of whether there has been . . . procedural bad faith as exhibited by, for example, its use of oppressive tactics or its willful violations of court orders." *Dow Chem. Pac., Ltd.,* 782 F. 2d at 345.   Bad faith requires that a claim be entirely without color. *Browning Debenture Holders' Comm. v. DASA Corp.,* 560 F.2d 1078, 1088 (2d Cir. 1977).

Although the 2005 Order did not directly address the issue of bad faith since it was not raised until appeal, there are portions of the 2005 Order which specify the conduct the Bankruptcy Court found to be most improper which relate both to DSDA's mental state and to harm to the bankruptcy estate.

Page 48-49 of the 2005 Order states:

> In light of (1) DSDA's fore-knowledge that the Trustees objected to the concurrent representation of Andersen and CFS, (2) the questionable efficacy of a conflict waiver that was based on a transaction among DSDA. CFS, J&B and Andersen that was arguably outside the reasonable expectations of creditors and had not been approved by this Court, and (3) the jurisdictional nightmare created when DSDA commenced representation of Andersen by entering appearances in the CFS-Related Securities     Fraud Litigation *prior* to both the disclosure of the conflict waiver and the determination of the legitimacy of the conflict waiver, the Court concludes that DSDA's eventual disclosure of the prospective conflict waiver, over a year after the transaction occurred, was tardy and resulted in an avoidable expenditure of resources by the estate, interested parties, professionals, this Court, the District Court, the Tenth Circuit, as well as disruption of this case, delay in concluding the administration of the estate by the Trusts, and the commencement of

23

avoidable ancillary litigation.

Footnote 35 to the text reiterates the need for court approval:

It was well known to all constituents of the estate and professionals engaged by the debtor, that Court approval was necessary for CFS to waive (or otherwise dispose of) intangible rights that were property of the estate.

. . .

CFS's right to compel counsel to avoid conflicting representation is likewise an intangible right constituting property of the estate, the waiver of which must be approved by the Court.

## A. DSDA'S MENTAL STATE

DSDA has argued from the beginning that the delay in disclosing the conflicts is fully justified under the law. First, DSDA argues that the Rule 2014 duty to disclose is confined, in the case of § 327(e) counsel, to the area of counsel's special employment and the courts will not disqualify or otherwise sanction §327(e) counsel for failure to disclose connections or conflicts that lie outside that area of employment. This court, and the Bankruptcy Court, finds this position not in accord with established bankruptcy law. However, the language of §327(e) could plausibly invite that interpretation. There is at least one court which supports this position.[16] A few other cases appear to fall in DSDA's camp depending on how the facts are parsed. The court finds DSDA's position on this issue to be sufficiently colorable and justified to avoid any finding of bad faith.

Secondly, DSDA argues the conflict described would not constitute a disqualifying conflict. As noted above, this does not excuse the failure to disclose. The bankruptcy court, not counsel, should determine disqualification. However, where the connection would not

---

[16] In re Servico, Inc., 149 B.R. at 1013-14.

have caused disqualification, as in the case at bar, this greatly reduces the opportunity for harm to the estate and  argues against a finding of vexatious behavior and bad faith. Neither Trustees  nor the 2005 Order have  articulated any improper purpose or advantage obtained by DSDA from the delayed disclosure of the waiver.

Third, DSDA's  position has been from the beginning that if it is was a disqualifying conflict, they had obtained a valid effective waiver of that conflict from CFS and there was, thus, no obligation to disclose.  Reading the above excerpt from the 2005 Order, it appears DSDA proceeding with the Andersen representation without opportunity for the Bankruptcy Court to approve the waiver is the conduct about which the Bankruptcy Court is most disapproving.

The undersigned entered a Report and Recommendation in the Rule 1.7 Disqualification Phase on November14, 2002, finding that the interests of CFS and Andersen were directly adverse and that DSDA could not represent both parties unless the conflict is waived under Rule 1.7.   That Report and Recommendation found that the waiver of the conflict must be approved by the Bankruptcy Court, which approval was never obtained.

Objections to the Report and Recommendation were filed on appeal to Judge Kern.  On April 4, 2003,  Judge Kern issued an order, termed an advisory opinion, which affirmed the Report and Recommendation in finding the interests of CFS and Andersen to be directly adverse, prohibiting DSDA from  representation of  both parties unless the conflict is waived in writing by CFS.   However, Judge Kern rejected the finding that the waiver must be approved by the Bankruptcy Court.  The opinion found that the waiver signed by CFS was a valid, fully effective waiver of the conflict and that DSDA could proceed in its representation of CFS and Andersen without approval of the Bankruptcy Court.

25

The 2005 Order appropriately discussed Judge Kern's order, noting that both Judge Kern and the Tenth Circuit described it as an advisory opinion. The 2005 Order further correctly noted the appeal was dismissed because Trustees did not have standing to sue. The Bankruptcy Court found the effect of Judge Kern's order as follows.

> The District Court stated that even if the Trustees had standing, however, it would conclude that although CFS's and Andersen's interests were adverse, DSDA complied with ORPC 1.7 in obtaining a waiver of the conflict from CFS. None of these conclusions, whether binding or not, have any relevance to whether DSDA had an obligation to disclose to this Court and parties in interest in this bankruptcy case the conflict waivers DSDA procured from CFS.[17]

Judge Kern's order may not be relevant to DSDA's obligation to disclose. Judge Kern did not opine on whether DSDA did or did not violate Rule 2014 disclosure. Whether or not Judge Kern's advisory opinion has precedential value as the law of the case, it is relevant to the presence or absence of bad faith and the appropriate sanction, if any, for non-disclosure under Rule 2014. The improper conduct of which Trustees complain is grounded in DSDA's not disclosing the waiver which would have given the Bankruptcy Court the opportunity to review, approve or disapprove the waiver. The Bankruptcy Court has found bankruptcy court approval of the waiver is required. The undersigned recommended that Bankruptcy Court approval of the waiver is required. However, Judge Kern has opined that the waiver is a valid waiver of the conflict which need not be approved by the Bankruptcy Court. This court cannot find bad faith where the offending conduct is failure to disclose a connection or conflict which Judge Kern has previously found has been properly waived and requires no approval from the Bankruptcy Court. Although Judge Kern's Order did not

---

[17]/ Order at 28.

address Rule 2014 disclosures, it did find appropriate and legal the conduct that was not disclosed–very strong evidence which mitigates against a finding of bad faith by DSDA. Judge Kern's specific finding was: "[T]he Court is persuaded upon review that DSDA had a reasonable belief that the representation of Andersen would not adversely affect the relationship with CFS."[18]

## B. HARM TO THE ESTATE

As previously discussed, the question of harm to the estate is not relevant to whether there is an obligation to make Rule 2014 disclosures. It is relevant to the appropriate sanction for that violation as evidenced by many cases cited in the 2005 Order. In response to DSDA's argument that there had been no harm to the estate and therefore no sanction is warranted, the 2005 Order finds:

> In any event, in this case, DSDA's non-disclosure was anything but harmless. DSDA's failure to timely, candidly, spontaneously and fully disclose the Letter Agreements entered into with CFS containing conflict waivers procured in order to allow DSDA to represent Andersen in the CFS-Related Securities Fraud Litigation has resulted in over four years of contentious litigation in three levels of courts, which has consumed an extraordinary volume of professional time, judicial resources and estate funds.[19]

The 2005 Order and Trustees' briefing on appeal in support of that Order do not articulate any harm to the estate other than attorney fees expended by the estate in litigating the two (2) phases of the DSDA Contested Matter. Thus, the burden is on Trustees to establish that all of the fees incurred in both matters over four (4) years were directly caused by DSDA's failure to timely disclose as above set forth.

---

[18] Case No. 02-CV-483, Dkt. # 41 at 7.

[19] Order at 56.

This court cannot find Trustees have satisfied that burden of proof.  It is difficult to forecast the litigation track that would have been pursued if timely disclosure had been made.  It is possible that the reference would have been withdrawn and the case would have proceeded much as it did with the same end result, that being Trustees failing in the attempt to disqualify DSDA from representing Andersen under Rule 1.7.   It is possible the Bankruptcy Court would have not approved the waiver and that ruling would have been appealed with the same result.  The court agrees with the position of DSDA that "DSDA certainly did not 'cause' the Trustees' decisions to launch Rule 1.7/Disqualification, or to pursue that relief when they know or should have known it had no chance of success and did not concern issues necessary to 'make the estate whole.'"[20]

The most salient point is that all of the costs awarded by the 2005 Order included all the attorney fees relating to the Rule 1.7 Disqualification Phase and the Rule 2014 failure to disclose proceedings.   The costs are divided $484,611.12   for the Rule 1.7 Disqualification Phase proceedings and $40,727.00   for the Rule 2014 proceedings.[21] Trustees were totally unsuccessful in the Rule 1.7 Disqualification Phase.  This court is not convinced that would have changed even if the Rule 2014 disclosures had been timely made.  Judge Kern issued his advisory opinion that the conflict waiver legally waives any conflicts under Rule 1.7.  There is no basis for awarding Trustees fees in their unsuccessful attempt to disqualify DSDA under Rule1.7 as a sanction for failure to disclose under Rule 2014.  This is not a harm suffered by the estate directly caused by the failure to disclose.

To sustain this portion of the  2005 Order would create a precedent in which a

---

[20] Dkt. # 47 at 65.

[21] The court finds no objection to this representation in DSDA's brief. Dkt. #47 at 60.

trustee could pursue disqualification proceedings with no jurisdiction and/or standing to sue, lose the case on the merits (or at least on the merits as set forth in Judge Kern's advisory opinion), have the case dismissed for lack of standing to sue and nonetheless be awarded attorney fees, which in this case totaled $484,611.12. Further, those attorney fees could be assessed against the party which prevailed on the jurisdictional grounds.

Trustees could have dismissed their pursuit of disqualification at any time but chose to proceed. Trustees' attempt to demonstrate that all their attorney fees in the Rule 1.7 Disqualification Phase were caused by the delayed disclosure were half-hearted and unconvincing. This court cannot find those fees were directly expended because of DSDA's delayed disclosure.

Trustees repeatedly urge, with supporting case law, that full disclosure of connections in compliance with Rule 2014(a) is essential so the Bankruptcy Court and the United States Trustee can determine whether a professional's initial or continued employment is in the best interest of the estate. Trustees go so far as to say "that is the very purpose of Rule 2014" so the "court can make an informed decision on whether the engagement is in the best interest of the estate." In the case at bar, the disclosures were delayed twelve (12) days from entry of appearance for Andersen in the first instance and thirty-eight (38) days in the second instance. After those disclosures were made, the Bankruptcy Court reviewed the disclosures and did not take any action to terminate DSDA's employment because of the conflicts, inferentially finding that DSDA's continued employment in the employment matters was in the best interest of the estate. Ultimately, the Bankruptcy Court approved the payment of all DSDA fee applications in connection

29

with such employment. It appears the "very purpose of Rule 2014" has been satisfied and the Bankruptcy Court found no harm to the estate from continued employment.

## IV.  RECOMMENDATION

In conclusion, this court affirms the finding of the Bankruptcy Court that DSDA did not make the disclosures required by Rule 2014 in a timely manner.  The disclosures were made twelve (12) days and thirty-eight (38) days after  DSDA entered appearances on behalf of Andersen.  After the disclosures were made,  the Bankruptcy Court did not terminate DSDA's employment and found it in the best interest of the bankrupt estate to continue DSDA's employment.

This court finds DSDA's reasons for the delayed disclosure are sufficiently colorable to avoid any finding of bad faith or improper purpose. This court does not find conduct so vexatious, wanton or oppressive to justify any of the  sanction award.

The court further concludes the conflict disclosed was waived and would not have disqualified DSDA.

The court further finds there was no harm to the estate other than attorney fees expended.  Attorney fees expended by the estate in the Rule 1.7 Disqualification Phase were not caused by DSDA's delayed disclosure. Attorney fees expended in the Rule 2014 Phase should not be shifted to DSDA because of the absence of bad faith.

The undersigned is aware this court has found a violation of Rule 2014 with no sanction for that violation.  This court does not find the conduct of DSDA to be sufficiently vexatious or oppressive to justify any sanction.

Accordingly, the court concludes the sanction assessed constitutes an abuse of discretion, not supported by the applicable law or facts and recommends the 2005 Order

and the 2006 Order be vacated.

## V.  OBJECTIONS

In accordance with 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b), a party may file specific written objections to this Report and Recommendation. Objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma within 10 days of being served with a copy of this Report and Recommendation.  *See* Fed. R. Civ. P. 6 (as to computation of time periods).  If specific written objections are timely filed, the district judge assigned to this case will

> make a *de novo* determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

Fed. R. Civ. P. 72(b).  *See also* 28 U.S.C. § 636(b)(1).

The Court of Appeals for the Tenth Circuit has adopted a "firm waiver rule" in connection with appeals from orders adopting a Magistrate Judge's report and recommendation.  "[T]he failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions.*"  United States v. One Parcel of Real Property,* 73 F.3d 1057, 1059 (10th Cir. 1996) (*quoting Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).  **Thus, a timely, specific and written objection is necessary to**

preserve an issue for *de novo* review by the assigned district judge and for appellate review by the court of appeals.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Haney v. Addison*, 175 F.3d 1217 (10th Cir. 1999); and *Talley v. Hesse*, 91 F.3d 1411 (10th Cir. 1996).

Dated this 30th  day of December 2008.


Sam A. Joyner
United States Magistrate Judge